Next we have Evanal Community Health Center v. Michelle Baass Next we have Evanal Community Health Center v. Michelle Baass And Ms. Doye, when you can catch your breath, you can come up to the podium. Good morning. Good morning. Thank you, Your Honors. May it please the Court, my name is Catherine Doye, and I represent plaintiffs, appellants, Evanal Community Health Center, and the other individually named federally qualified health centers in this matter. I would like to reserve five minutes for rebuttal. Very well. Thank you. As a first matter of the District Court's error, the District Court focused on, with respect to the FQHC payment right in Section 1396ABB, whether or not the FQHCs must elect fee-for-service payment for pharmacy or not whether the fee-for-service rate must comply with Section 1396ABB. And in finding that, it was apparent that the District Court did not understand the legally cognizable theory that we had alleged in the complaint relating to the requirement that the fee-for-service pharmacy rate comply with Section 1396ABB. Namely, if you look at the FQHC reimbursement statute under California law, Welfare and Institutions Code 14132.100K, it expressly allows FQHCs to elect between the fee-for-service rate or a prospective payment system rate for the reimbursement of pharmaceutical services. And it's our position in the complaint that once the California legislature establishes this right to elect a fee-for-service rate, and that right is also incorporated in the state plan relating to FQHCs, which is attachment 4.19B, that any of those rates must comply with Section 1396ABB and be reimbursed on a cost-based reimbursement rate. Based on a what kind of, did you say? Cost-based. And what's happening here is that you're allowed to carve out your pharmaceuticals, right? That is true. And the government, in this case the state of California, says when you carve those out, instead of negotiating the price at a PPS rate with your HMO, we'll pay you directly for what you paid for those pharmaceuticals and you get a bargain rate at a 340B, so you don't lose any money, but you don't make the money you used to make when you bought low and sold high through the PPS, right? So what they've done is to cut out a middleman and they've cut down their cost. And you're complaining about that, saying you have a statutory right to continue to negotiate with a middleman and make more money. And I can understand that because most people like to be in business and make more money. Actually. But where's your statutory right to make more money? All right. Well, we are not asserting that we have the right to be reimbursed through managed care. What we are arguing is, or what we've alleged, is that we have a right to be reimbursed at a fee-for-service rate that complies with Section 1396ABB, which is not the negotiated managed care rate, and it's not the prospective payment system rate that applies generally, where the cost of all FQHC services are bundled together and then divided by the Medi-Cal visits and you get paid a per-visit rate. This would be a special rate just for pharmacy services under Section 1396ABB, and it must be based in a manner that reimburses FQHCs for costs. So we're alleging that the system — I'm missing some words when you speak. I'm sorry. Based on a rate — That is essentially based on cost, the cost of providing the services. That's right. The cost to you under 340A. 340B. 340B. Okay, but the actual acquisition cost that is established in the SPA does not mean the actual amount you pay. It is the 340B ceiling price that the manufacturers are required to invoice all covered entities, and that ceiling price may be different than what they actually invoice you at. I know it's — They might invoice you at lower than the ceiling price? They might invoice you at higher than the ceiling price. That's the concern. Then you wouldn't be getting the 340B price. Well, you can bill the Medi-Cal program at a rate lower than the 340B. You have to bill the Medi-Cal program at a rate at either the 340B ceiling price or less if you actually pay less. What's not covered is when the manufacturer charges you more than the 340B ceiling price. But how can the manufacturer, if he's following the law, charge you more than the 340B price when you're part of the protected group that has a right to buy at the 340B price? Explain that to me. I agree with you completely, Your Honor, and there is — You agree with me that they can't, right? And so they don't, so let's go on to something else. Well, they can't, but they do, and in fact — Well, then don't pay them. Well, we don't have that choice. We are — that's a different issue. If they overcharge us, we have to go through the alternative dispute resolution process, but we still can only bill the Medi-Cal program the 340B ceiling price. That's right. You can only bill what the law says that you're entitled to buy at. Right. But if the manufacturer overbills you, you have to go to the alternative dispute resolution and say, That's part of the business. Right, but under Section 1396ABB as a federally qualified health center, you are entitled to be reimbursed for your costs, and that is more than — But you don't have to pay an exorbitant invoice. You can go to alternative dispute resolution. Maybe I'm wrong, but isn't that the fact? Well, it's not quite as simple as that. You have to hire a lawyer. Oh, and what are you? Well, that's a different — the point is, Your Honor, that the actual acquisition costs and the professional dispensing fee contained in the SPA were established not under Section 1936ABB, but under the general Medi-Cal provider reimbursement statute, 1396A30A, which only requires reimbursement to ensure quality of care and access of care generally. And our position is that for FQHCs, there's a higher standard, which is to reimburse FQHCs in a manner that reimburses them for costs, and that the SPA does not do that because it only — it doesn't include shipping costs. It caps it at the 340B ceiling price, even though there's a well-documented problem with manufacturer overcharges. In fact, 42 U.S.C. 256B, which is the adoption of the public health services at 340B, so it's basically the 340B statute, has a whole section on improvements in program integrity and manufacturer — Why should the state of California pay you more because a manufacturer overcharges you and you don't dispute it under an alternative dispute resolution? We can't — we would dispute it under an alternative dispute resolution. Then? Years later, if we prevail, we would have to repay the state of California. But in the meantime, we're footing the bill. But, Yorta, I'd like to just mention that one of the problems that — or one of the costs that is not covered under the SPA for any covered entity is that because you have to bill the Medi-Cal program at the 340B ceiling price or what you actually paid, for each and every claim, the covered entities need to check to see what the 340B ceiling price is and then bill that, and that is a tremendous administrative burden. They have to hire additional staff. They have to oftentimes purchase special software. I can understand that. Why don't you go to Sacramento and tell the people that? Well, because I shouldn't need to because under the FQHC Section 1396ABB, those kinds of administrative overhead costs are to be — any reasonable and allowable costs are to be included in the reimbursement rate for FQHCs. Counsel, I want to make sure. So 1396ABB guarantees you the PPS, and that's what you want. Is that correct? But 1396ABB, actually, the only thing it guarantees is that when you have a new rate established, it needs to be equal to 100% of the cost of furnishing the services based on a center that has a comparable provision of services. And generally, as I was saying, actually the comparable methodology is not really used. There's an alternative payment methodology that's used where the FQHC submits its cost report for the entire fiscal year for all the services, and then that's divided by the visits, and then there's a per-visit reimbursement rate that is set. And so that's the traditional PPS rate is a per-visit rate based on either the cost of a comparable clinic divided by visits or a cost report that is used. But here we're carving the pharmacy services out of that PPS rate, and so we're establishing a different fee-for-service rate, and that needs to comply with 1396ABB6. The reason I started down there, and I appreciate the distinction that you've drawn, is that the district court found that there was no basis for claiming, I'm quoting from the district court, you're not required to have your pharmacy services reimbursed under the FFS methodology established by SPA 17. Simply no basis for plaintiff's contention that fails to satisfy 1396, that it is separate and apart from PPS. Plaintiffs can still elect to reimburse pharmacy services through their PPS rate. Right, and that's exactly what we're challenging here on appeal. And you're challenging what? That the district court is wrong on that? Or that it's irrelevant? Yeah, the district court is correct that there is an election, but the election is between what? Just because the FQHCs can carve pharmacy back into their PPS rate, and then that would meet the requirements of Section 1396ABB, does not mean that this fee-for-service rate that they are also allowed to elect does not have to meet. Right, but if you're allowed to elect one of two different things, and I appreciate they're slightly different measures. One is this is a charge for our pharmacy services alone, and this is a charge for per-patient visits with the pharmacy all wrapped in here together.  But as long as you have a choice between those two, and you can elect whichever one you think is to your financial advantage, what runs afoul of 1396ABB? Because the fee-for-service rate that you're electing between was not established based on cost. It's established, they're applying the general pharmacy fee-for-service reimbursement rate that the report that was used to establish that only looked at whether it met the requirements of 1396A30A, which is a general Medi-Cal reimbursement standard, not the FQHC specific one. And the election option is in the FQHC reimbursement statute, California Welfare and Institutions Code 14132.100K, and that ties into Section 1396ABB. And the reason is because FQHCs receive a special Section 330 grant from HRSA to provide services to the medically uninsured, people who have no insurance. And so the Medi-Cal program's required to reimburse for the cost of providing services to Medi-Cal beneficiaries so that FQHCs aren't dipping into the grant that's reserved to cover the services for the uninsured. And so that's why all FQHC reimbursement rates, fee-for-service, prospective payment system that's based on comparables, prospective payment system that's based on cost reports, they all need to reimburse based on cost. And CMS and the district courts say Section 1396ABB is just not relevant, but it is required to be relevant by Congress in Section 1396ABB whenever you establish a reimbursement rate for Medi-Cal that applies to FQHCs. May I ask some elemental questions? You're apparently saying you have a right, your people have a right to carve out the pharmacy and have it reimbursed for costs based on the fee-for-service rate, right?  Okay. And then you say the fee-for-service rate that has been applied, which is the cost that you paid under 340B, has been incorrectly computed. Why was it incorrectly computed? I guess that's not exactly what I'm saying. Okay. What I'm saying is that we can elect to be reimbursed fee-for-service, but the fee-for-service rate needs to be established consistent with Section 1396ABB. The fee-for-service rate that's being applied was established under 1396A, A30A, and it doesn't include, for example, shipping fees. It doesn't include the cost of administering the program to make sure that you're not billing the Medi-Cal program more than the statutory 340B ceiling price, which is not required under federal law. That's purely California statute. And Section 1396ABB says that FQHCs' rates need to incorporate all of the costs of complying with the Medi-Cal program so you don't subsidize the Medi-Cal program using the HRSA grant. Do you have all those costs listed in any of your papers? We do. Can you point to me where those costs are and then point to me whether or not the district court considered those costs? Well, where we are right now is just the pleading stage. And in our complaint, we do plead, if I can find it, that there are these the shipping fees are not caught, are not included, that the administrative fees of doing the claim-by-claim, checking to make sure you're not exceeding the 340B ceiling price, they're simply not included in the SPA because that applies also to retail pharmacies who don't have to do those things. So it's sort of the lowest bar. Are there any numbers that you gave the district court to show the difference between the 340B reimbursement price and your administrative costs and shipping costs? No, we did not give specific numbers in our complaint. I mean, what we're alleging is a violation of the statute, first and foremost. And then it's – You want to be able to prove that at trial? We want to be able to prove the amounts at trial. But the actual – the fact that there are shipping fees is not disputed. The fact that these administrative burdens and the cost of those are not being reimbursed is not disputed. Counsel, you've eaten into your five minutes. So do you want to save the – I'd like to ask a couple of questions if I could. So, Counsel, I'd like you to take me through 1396ABB. We've just been referring to it generally, but I just have a couple of questions about that, and I'd appreciate the opportunity to ask a couple more questions. So would you point out to the section to me that provides the reimbursement right that you're claiming here? Yes. It is actually section 1396ABB6 because the only specific – The one that gives you the right to your costs. It's 1390 – what's the whole of 1396ABB? Well, there's a whole bunch of sections there. You don't have any particular subsection. We've got a whole bunch of numbered sections here. Okay. Well, you have to – you start with – because this is not covered by paragraphs 1 through 4, it falls within paragraph 6 as an alternative payment methodology. And under subsection 6, the reimbursement rate must result in payment to the center or clinic of an amount which is at least equal to the amount otherwise required to be paid to the center or clinic under this section. And if you go back up to subparagraph 4, that, for example, says that the clinic must be reimbursed equal to 100% of the cost of furnishing the services during the fiscal year based on the rates established under this subsection for the fiscal year or other centers or clinics located in the same adjacent or adjacent area with a similar caseload. So that's how it ties back into all of these. And if you look at subsection 2, which doesn't – sort of is a little bit obsolete, you set the reimbursement rate at a rate that is equal to 100% of the average of the cost of the center or clinic of furnishing such services, in that case during fiscal years 1999 to 2000. And number 4, in a case in which an entity first qualifies after fiscal year 2000, the state plan shall provide for payment of the services. And that ties into what I was just saying. Sorry. That was helpful. Thank you. Okay. I'll reserve my last 35 seconds. All right. I didn't even get to talk about the other issues. That's okay. Counsel, I'll give you a couple of minutes. All right. Next, I believe it's Mr. – is it Frueh? Free.  Good morning, and may it please the Court. Joseph Free on behalf of the administrator of CMS. I plan to argue for no more than 13 minutes and give the balance of our side's time to counsel from the Department of Health Care Services. And I'll begin with where counsel for the appellants left off, which is their alternative payment methodology theory, which comprises the bulk of this appeal. And it's our position that this theory is not even properly before the Court. And I think the best way of illustrating this point is to look at the appellant's opening brief and their reply brief and noting that alternative payment methodology, APM, and that statutory section that Ms. Doyer referred to, 1396ABB6, those terms appear in the briefs 60 times. How many times do those terms appear in the First Amendment complaint, which stretches 133 paragraphs? Zero times. And that's because this new theory was never alleged in the operative First Amendment complaint. It emerged for the first time in opposition to our motions to dismiss. Both the defendants pointed out that this new theory was not in the operative complaint, but the plaintiffs did not move to amend their complaint. At the hearing on our motions to dismiss, the district court pointed out that this new alternative payment methodology theory was not contained within the operative complaint and inquired with counsel whether, if the motions were granted, whether leave to amend should be provided, and counsel declined, saying that leave to amend wasn't necessary. I would submit that under these circumstances, this theory that, again, comprises the bulk of the appeal is no longer properly before the Court. Second, even if this theory were properly before the Court … Did the district court address the theory on the merits? It did, Your Honor, briefly, yes. But I would point out that the degree to which we were able to address the theory on the merits was within a reply brief that was limited to five pages. Okay, but you were able to brief it here. We were able to address it, and so far it's been alleged in briefs. But I would say that the full contours of this theory are sort of a game of whack-a-mole. It changes, and I think it's unfair to the defendants to have to argue a theory that isn't self-contained in some type of pleading. But even if the theory were properly before the Court, I think plaintiffs run into some other problems. Foremost, they can't establish Article III standing to pursue this theory. And as the Supreme Court reminded us several times this last term, standing is not dispensed in gross. It needs to be established for each theory in the complaint, as well as each type of relief that is sought. And here, the plaintiffs have not established a concrete and particularized injury for any one of the remaining plaintiffs in this case. So starting with injury in fact, their basic injury that they're alleging here is that they are being paid for the drugs that they prescribe their patients under the formula in State Plan Amendment 17-2, under this fee-for-service formula, instead of the prospective payment system. That is their alleged injury. But as they conceded in the district court, they have no idea whether that amount is — whether the fee-for-service payment is more than or less than the prospective payment amount. In fact, they might be getting more than they would otherwise receive under the prospective payment amount. It's notable that the plaintiffs sought a temporary restraining order in the district court. That temporary restraining order was denied at Clerk's Record 54, and the district court found that the plaintiffs couldn't even demonstrate economic harm, let alone the irreparable harm that would be required for a temporary restraining order, and the plaintiffs never appealed from that order. Now, the plaintiffs not only failed to establish an injury in fact, they also can't establish causation. And that's because this hypothetical injury, getting paid under the fee-for-service schedule instead of the prospective service system — I mean, the prospective payment system, that situation is not fairly traceable to State Plan Amendment 17-2 or Medi-Cal Rx. That state of affairs is fairly traceable to the plaintiffs' voluntary election to carve out pharmacy benefits from the scope of services under which they get prospective payment systems. And as we — prospective payment system payments. And as we pointed out in our Rule 28J letter, a plaintiff who voluntarily incurs the injury about which they complain is — the injury is not fairly traceable to the defendants. It's fairly traceable to the plaintiffs. I think the Supreme Court echoed this in the recent FDA v. Alliance for Hypocratic Medicine, where the plaintiff doctors were held not to have standing because they could simply refuse to engage in the injury-causing behavior about which they complained. Similarly, in the D.C. Circuit's National Family Planning case, the D.C. Circuit held that if the plaintiff has within its own means the ability to avoid the alleged injury about which they complain, they not only have failed to establish causation, but they've also failed to establish an injury in fact. And then the final point on standing on this APM theory is redressability. They have — the plaintiffs have failed to establish that their alleged hypothetical injury here is likely to be addressed by setting aside State Plan Amendment 17-2 or Medi-Cal Rx. And here's how we know that. If a court were to set aside State Plan Amendment 17-2 and Medi-Cal Rx as causing the plaintiff's injury, well, these same enactments could be reenacted in identical form, and all that would have to be done is eliminate this 20-year-old vestigial provision that allows FQHCs to elect to receive fee-for-service instead of the prospective payment system. If that were removed, then their injury would go away. And so for that reason, I don't think the plaintiffs have established that it's likely that the relief they seek would actually address the hypothetical injury that they haven't really even established in the first place. Next, even if this theory were — this APM theory, this alternative payment methodology theory, were properly before the court, even if the plaintiffs had established standing to pursue it, which they haven't, they would then run into another barrier in terms of asserting APA claims against CMS, which is that the APA, specifically 5 U.S.C. Section 704, prohibits APA claims where there's an adequate alternative remedy. And here, the First Amendment complaint reveals the alternative adequate remedy to an APA claim, which is a Section 1983 claim against the state Medicaid agency. And from the First Amendment complaint, the claims and the theories are completely overlapping. The relief sought is essentially the same. Clearly, a Section 1983 claim against the Department of Health Care Services provides an alternative and adequate remedy. In the plaintiff's reply brief, they say that Section 1983 is not adequate because they're not able to get damages against — from the state because of state sovereign immunity. But that's just a red herring because you can't get damages under the APA either. So that doesn't really point out any inadequacy for a Section 1983 claim against the state Medicaid agency. As, again, the First Amendment complaint reveals, they can get the same relief that they want simply by pursuing 1983 claims against the state as opposed to seeking APA claims against CMS. And then another alternative remedy would be a petition for writ of mandate in state court, which is exactly what happened in the case Tulare Pediatric Healthcare v. DHCS. Health Center filed a petition for writ of mandate in state court to enforce the state's ABB and obtained that remedy. So, again, alternative adequate remedies abound that would preclude an APA claim. And then, finally, I would just touch on the — I said the alternative payment methodology really comprised the bulk of plaintiff's appeal, but they also had raised this preemption argument. But it appears that by the time they get to their reply brief, the plaintiffs have all but abandoned it because they know — they don't respond in any meaningful way to the answering brief's points that tamp down their preemption argument. Instead, the only time that they mention preemption is to say that they're not really arguing about preemption anymore. Instead, as per — has been their modus operandi in this case, the plaintiffs switch gears again and their new theory is that CMS failed to adequately consider the pervasiveness of the Medicaid exclusion file and the administrative burdens that Paragraph 7 of State Plan Amendment 17-2 imposes on the federally qualified health centers. Now, as I alluded to before, I think this is just a new theory that they have raised in their reply brief, so it's improper for that reason alone. But even if we were to look at it on its merits, I think it's first important to point out that a federal agency — like, as a general matter, a federal agency is not required to consider every possible issue that a plaintiff in litigation can come up with. Rather, as this Court pointed out in Oregon Natural Resources Council v. Thomas, whether an agency has overlooked an important aspect of the problem turns on what a relevant substantive statute makes important. And the plaintiffs, although they say that CMS failed to consider the pervasiveness of the Medicaid exclusion file or the administrative burdens imposed by Paragraph 7 of State Plan Amendment 17-2, they don't point to any provision in the Medicaid statute that required CMS to really consider those issues when it approved State Plan Amendment 17-2. Instead, the Medicaid statute says the Secretary of Health and Human Services shall approve any plan which fulfills the conditions specified in Subsection A. And Subsection A of the Medicaid statute doesn't talk about considering the pervasiveness of the Medicaid exclusion file and things like that. And I think on this point, it's just also important to point out that this provision of State Plan Amendment 17-2 that the plaintiffs have attacked originally under a preemption theory but now under a slightly different theory in their reply brief, it's important to point out that this provision, which the plaintiffs call kind of like a duplicate discount avoidance provision, it wasn't originated in State Plan 17-2. This provision actually originated many years earlier and was approved by CMS back in 2014. It was codified at California Welfare and Institutions Code 14105.46, and it spawned several years of litigation. It was the AIDS Healthcare Foundation v. Douglas cases, several years of litigation, and this Court ultimately upheld that provision. So the plaintiffs really haven't explained in their new theory why CMS was at all obligated to take another look at a provision that it had approved years prior and which this Court had already upheld after multiple years of litigation. I think those are the primary points that I want to address. I would just, in closing, reiterate that I think at this point it's quite clear that this case really is not about the plaintiffs getting the payment to which they are entitled to receive under the statute. They are now and have always been able to obtain that payment. What this really is is really just an arrow in a quiver of lobbying efforts to get as many concessions from the State of California as the plaintiffs can obtain as California transitions to this one-payer model. And I think at this point this litigation has rather run its course, and the Court should affirm the district court's judgment below. Any other questions? No questions. All right. Thank you. Thank you very much. Mr. Sondheimer. Good morning, Your Honors. May it please the Court. I'm Joshua Sondheimer on behalf of Appellee Michelle Bass, the Director of the California Department of Health Care Services. Your Honors, the appellants only claim against the directors that SPAS 17-2 somehow created an alternative payment methodology but does not meet the PPS equivalency requirement for such an APM. Their argument fails for two primary reasons. First, the district court did not abuse its discretion in dismissing plaintiff's action without leave to amend because the theory was not alleged in the complaint, as my colleague already has identified, and plaintiffs specifically waived any intent to amend their complaint to assert the theory. For all the reasons set out in our papers, any amendment at this point would now be futile because SPAS 17-2 does not and cannot create an alternative payment mechanism. The SPA governs reimbursement for all types of providers. It was not created or designed to apply solely to FQHCs, and the plaintiffs can't establish and fail to establish that Section 1396 ABB, the requirements to create an APM are met in this case, or even that payment under the SPA would be less than the PPS rate. The fundamental flaw with plaintiff's theory that reimbursement under SPA 17-2 must meet PPS requirements is that the centers here have specifically chosen to opt out of the PPS system and to be instead reimbursed under an entirely separate fee-for-service system. They have not articulated any reason why this separate reimbursement for their pharmacy services that they've elected to receive specifically and expressly under the fee-for-service system must then also meet the PPS requirements. If they wish to receive PPS reimbursement for their pharmacy services, they have that option. That's still available to them to carve their pharmacy services within their PPS rate. But in order to opt out of that system, they must specifically submit a change in a formal document called a change in scope of services to the Department of Health Care Service to literally carve those services and the cost of those services out of their PPS reimbursement. That's what entitles them to be reimbursed under an entirely separate optional system. By doing that, they're opting out of PPS reimbursement and they just simply have failed to establish any reason why that separate reimbursement that they've elected to receive must then still meet PPS requirements. Pardon me. You're obligated to pay them a PPS amount, correct? Correct, if they've chosen to be reimbursed for PPS. If they chose to carve out and buy their drugs more cheaply and then charge you at the PPS rate, you're not hurt because you're obligated to pay them under the PPS rate anyway, right? Your Honor, yes, I think, just to clarification, I think you referred to the PPS, the payment under the PPS rate. If they're purchasing their drugs through the 340B program, they're charged the actual acquisition cost. They're entitled to receive the actual acquisition cost plus a dispensing fee. But if they don't choose to carve out, you would have to reimburse them at the PPS rate. Correct. If they choose to carve out and can make a buck on the side by buying low and negotiating a higher rate within the PPS rate, you're not hurt anyway, are you? The State is not, no, Your Honor. No. So why don't you do that for them? I mean, if it's no money out of your pocket, why don't you allow them to make a buck? Well, that was, I mean, that was the policy prior to the adoption of Medi-Cal Rx is that the State allowed the centers to make that extra buck. But now under Medi-Cal Rx, the pharmacy benefit is no longer within the managed care system. So the centers can no longer negotiate a rate with the managed care plans. Instead, they bill for pharmacy services directly. So the Medi-Cal Rx plan means that the State can save some money if there's a carve out from the PPS rate, right? Well, the State didn't, the State, it does save money, yes, essentially. That was a significant reason for the Medi-Cal Rx. Oh, okay. Program. Got you.  I think I've made the principal points, Your Honor, with respect to the claim against the director. I would just say the plaintiffs asserting new issues that really were not raised in the papers relating to their alleged inability to receive costs. There was a claim in the district court that CMS had failed to consider certain costs in approving SPA 17-2. That was not an issue that is presented to this Court on appeal, and we don't believe the Court should consider it. Thank you very much. Thank you. Any additional questions? No more questions. All right. Thank you. Why don't we put two minutes on her time? Thank you, Your Honor. All right. All right. First, on the concern about whether the APM theory was sufficiently alleged in the complaint, we alleged in paragraphs 25, 46, 55, 59, and 66 that the SPA reimbursement rate does not comply with 1396 ABB. It is true we did not use the term APM, and we did not specifically call out subparagraph 6, but if you review the transcript of the hearing, the Court asked, if I conclude that your claims as currently pled or even as referred to in opposition briefs where some theories that I don't think were pled are raised that those theories, too, are not cognizable, why do you believe that leave to amend would not be futile? And the answer is that if the district court found that all of our theories, including the ones in our opposition brief that raised the APM, were not legally cognizable, it would not — it would have been futile to try to amend the complaint. But if this Court finds that any of our claims are legally cognizable, we would reassert our desire to amend the complaint as necessary to address issues like that. But that's effectively asking us to decide an issue that you didn't plead, which if you then decide that it might be meritorious, you would be willing to amend your complaint in order to include. It just feels like the whole thing is backwards. Well, we think that under the short and short — actually, I'm missing the thing. Statement of a claim. Our position is we didn't have to call out APM or subsection 6. So your position is that you have adequately pled it. Right. But if we were given an opportunity to amend again, we would clearly address the things that are concerning the court and respondents to be more clear on that issue. I thought you were given an opportunity and you chose not to. What I was — Am I wrong about that? The court asked whether if he found that none of our theories as alleged in the complaint or as argued before him were — none of them were legally cognizable, would amending the complaint be futile. And basically we agreed that if he found that none of those theories were legally cognizable, it would be futile to amend. So we would not seek to amend something where it would be futile. If it would not be futile and our theories were found to be legally cognizable but not adequately pled, we would seek to amend. Thank you, counsel. Any additional questions? I'm sorry. I'm standing. I think you're out of your time, but I appreciate the arguments today. Thank you so much for your presentation. Thank you. To both counsel, to all three counsel, actually. Thank you very much. This matter will be submitted.
judges: BYBEE, BEA, MENDOZA